# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 06-1304

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

GALE NETTLES,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 CR 699—**John F. Keenan**, Judge,
United States District Court for the Southern District of New York,
Sitting by Designation.

ARGUED OCTOBER 2, 2006—DECIDED FEBRUARY 12, 2007

Before MARTIN, GIBBONS and SUTTON, *Circuit Judges.*[Œ]

BOYCE F. MARTIN, JR., *Circuit Judge.* Gale Nettles was charged with attempting to destroy the federal courthouse in Chicago, attempting to provide material support to terrorism, manufacturing counterfeit money, and distributing counterfeit money. After a jury trial, he was convicted on all charges except for attempting to provide material

---

[Œ] Boyce F. Martin, Jr., Julia S. Gibbons, and Jeffrey S. Sutton, Circuit Judges for the United States Court of Appeals for the Sixth Circuit, sitting by designation.

support to terrorism, and sentenced to 160 years. On appeal, Nettles alleges that the district court erred by refusing to transfer the proceedings to a different venue, denying Nettles's motion to sever the terrorism and counterfeiting counts, and denying Nettles's motion to prohibit introduction of tape-recorded conversations between himself and a non-testifying individual. For the reasons that follow, we AFFIRM the convictions.

**I**

The events leading up to this case began on September 5, 2002, when Gale Nettles was sentenced to a twenty-four month prison sentence after pleading guilty to the crime of counterfeiting United States currency. While incarcerated at the Federal Correctional Institute in Yazoo City, Mississippi, Nettles met fellow inmate Cecil Brown, a former rancher and auctioneer who was serving time for racketeering and fraud convictions. Nettles and Brown initially discussed the possibility of laundering counterfeit bills through Brown's business, but soon thereafter Nettles revealed that he had other plans in mind. Nettles asked Brown whether he had ever used ammonium nitrate, the substance used to blow up the Oklahoma City federal building, as a fertilizer in his ranching business. Nettles remarked that a larger bomb "could have brought the whole . . . building down."

In August 2003, Nettles and Brown began discussing Nettles's intent to bomb the federal courthouse in Chicago, the Dirksen Federal Building. Nettles told Brown that he was "[v]ery serious" about his plan, and explained the details, which included placing the bomb in a tractor-trailer, driving down a ramp to the building's dock, removing the trailer from the tractor, and driving off in the tractor.

Brown informed prison officials of Nettles's plan. These officials put Brown in touch with the FBI. Under the FBI's direction, Brown gave Nettles the phone number of an individual who was supposedly Brown's nephew and would be able to help Nettles obtain ammonium nitrate. This number was actually an undercover phone number at the FBI office in Shreveport, Louisiana. Upon his release in October 2003, Nettles went to Chicago. After calling a few times, Nettles was eventually put in touch with Gary Beasley, an undercover officer for the FBI, who was posing as Brown's nephew. Beasley claimed to be a Louisiana farmer with access to ammonium nitrate fertilizer.

On January 14, 2004, Beasley came to Chicago and met with Nettles. Nettles told Beasley that he wanted to build a bomb that would bring down the entire Dirksen Federal Building because he was upset with the federal judicial system and further, because the building blocked the view of the lake. During this conversation, Nettles revealed that he was into "graphic arts" and made money "the old-fashioned way," meaning that he manufactured counterfeit money. Nettles explained that his plan was to generate counterfeit money and use it to finance his bomb plan. Nettles also asked Beasley whether he was interested in buying counterfeit money.

Nettles and Beasley continued their correspondence over the phone. In March 2004, Beasley sent Nettles a computer and printer so that Nettles could print counterfeit currency. That same month, an informant hired by the FBI, Sylvia Anicua (who called herself "Maria") introduced herself to Nettles. When Nettles mentioned that he made counterfeit money, Anicua told Nettles that she knew someone who would be interested in purchasing it. Between May and June, Nettles made four deliveries of counterfeit money (totaling $52,200) to Anicua, in exchange for $5,500 in real United States currency which was supposedly from Anicua's contact. In July, Nettles

sent a fifth shipment of $9,000 in counterfeit bills to Beasley. Beasley later told Nettles that in exchange for the counterfeit money, Beasley would provide Nettles with any amount of ammonium nitrate fertilizer that Nettles wanted.

Upon learning that he would be able to obtain the fertilizer, Nettles contacted Anicua and asked her if she knew anyone associated with Hamas or al-Qaeda. Anicua introduced Nettles to an undercover agent who was posing as a taxi driver and al-Qaeda member named "Ali." Nettles told Ali he would sell him a half-ton of ammonium nitrate for $10,000 and stated that this was the same substance used to bomb the Oklahoma City building. He told Ali that he had the federal courthouse in Chicago in mind as a target.

On July 26, 2004, Nettles informed Beasley that he had rented a locker at a storage facility for storing the ammonium nitrate fertilizer and stated that he would probably use it within the next six weeks. Nettles also told Beasley that he had met Hamas and al-Qaeda members and could get five or ten thousand dollars for selling them the fertilizer. Nettles told Anicua that he could get more fertilizer and asked her to find out how much Ali wanted. On July 31, 2006, Nettles, Anicua, and Ali met. Nettles described to them how to create a time bomb using diesel fuel and ammonium nitrate, and again mentioned that he had the Dirksen Federal Building in mind as a target. Nettles noted the "impact" it would make on the country if this happened while judges were inside.

On August 2, 2004, Beasley told Nettles that he had packed a ton of ammonium nitrate on his truck.[1] Two days

---

[1] The substance supplied by Beasley was actually urea, not ammonium nitrate fertilizer.

later, Beasley picked up Nettles at his home in Chicago and drove to the locker Nettles had rented. Although Nettles and Beasley intended to unload a half-ton into the locker (reserving the other half-ton for sale to Ali), they were only able to place 537.5 pounds into the locker, leaving just under 1,500 pounds for Ali. Nettles directed Beasley to a location in a park where they agreed Beasley would park the truck the next day. Beasley was to then walk away and allow Nettles's al-Qaeda contact to remove the ammonium nitrate from the truck.

On the morning of August 5, 2004, Nettles met with Anicua and walked to the park. As planned, Beasley drove up, parked the truck in the park, and walked away. Nettles and Anicua observed through binoculars as undercover agents unloaded the fertilizer from Beasley's truck and placed it into another vehicle. After the truck was unloaded, Nettles and Anicua walked to Ali's taxi where Ali was waiting, and Ali paid Nettles $10,000. Soon thereafter, FBI agents arrested Nettles.

On September 1, 2004, a grand jury returned a nine-count indictment charging Nettles with attempting to destroy a federal building by fire and explosive (18 U.S.C. § 844(f)(1)), attempting to destroy a building used in interstate commerce by fire and explosive (18 U.S.C. § 844(i)), attempting to provide material support to terrorism (18 U.S.C. § 2339), manufacturing counterfeit currency (18 U.S.C. § 471), and five counts of transferring counterfeit currency (18 U.S.C. § 473).

## II

Before trial, Nettles moved for recusal of the district court judge and transfer to another district. Both motions were denied. *United States v. Nettles*, 349 F. Supp. 2d 1085, 1088 (N. D. Ill. 2004). On appeal, the Seventh Circuit reversed in part, ordering that the district court

judge recuse himself, but did not rule on Nettles's motion to transfer. The Court also decided to recuse all Seventh Circuit judges from hearing any subsequent appeal. *In re Nettles*, 394 F.3d 1001, 1003 (7th Cir. 2005). District Judge John F. Keenan from the Southern District of New York was assigned to preside over the trial.

Nettles brought six pretrial motions, three of which are at issue in this appeal. The district court denied Nettles's motion to transfer, finding that there was no showing that Nettles could not receive a fair and impartial trial in the Northern District of Illinois. D. Ct. Op., June 29, 2005, at 5-6.

The district court also denied Nettles's motion for severance of counts, ruling that Nettles's counterfeiting activity was part of a common scheme and plan to destroy the Dirksen Federal Building, and that there was no unfair prejudice caused by joinder of the offenses. *Id.* at 5-6. Nettles also moved to preclude the government from playing at trial tape recordings of conversations between Nettles and other participants unless the government called these participants to testify. At the time, he did not know whether all persons on the tapes would be called as witnesses. The district court denied Nettles's motion, ruling that there is no Confrontation Clause violation where the statements are used for purposes other than establishing the truth of the matter asserted. *Id.* at 7-9. Nettles was convicted by a jury on September 1, 2004, on all counts but the count for attempting to provide material support to terrorism. He was sentenced on January 12, 2006, to eight consecutive terms of 20 years each, for a total of 160 years.

## III

Nettles sought a transfer of venue under Fed. R. Crim. P. 21(a), which requires a change of venue "if the court is

satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." The district court denied the request, noting that the jurors in Nettles's case would not have been jurors at the time Nettles intended to destroy the courthouse, that the pretrial publicity had been less pervasive in Nettles's case than in other cases from the Northern District of Illinois that were not transferred, and that "[n]othing has been presented to the Court to demonstrate that defendant cannot receive a fair and impartial trial in the Northern District of Illinois with a jury from the district." D. Ct. Op., June 29, 2005, at 5-7. Nettles challenges this ruling on appeal, asserting that jurors sitting in the very building he was accused of attempting to destroy could not realistically be asked to put out of mind the potential death and destruction his acts would have caused.

We review a denial of a request for change of venue under Rule 21(a) for abuse of discretion. *United States v. Garza*, 664 F.2d 135, 139 (7th Cir. 1981). Abuse of discretion will not be found unless the facts compel—and not merely support—a finding that a change in venue is necessary. *United States v. Morrison*, 946 F.2d 484, 489 (7th Cir. 1991).

Courts have typically analyzed whether there is prejudice under Rule 21 by looking to pretrial publicity. Prejudice can be established by either a showing of actual prejudice, for example, when jurors can be shown to have exposure to pretrial publicity that prevents them from judging the case impartially, or by presumed prejudice, which occurs in cases surrounded by a "carnival atmosphere," where "pervasive and inflammatory pretrial publicity" makes juror bias inevitable. *United States v. Peters*, 791 F.2d 1270, 1296 (7th Cir. 1986) (superseded on other grounds, as stated in *United States v. Guerrero*, 894 F.2d 261, 267 (7th Cir. 1990)) (citations omitted). In reviewing denials of requests to change venue, we have

stated that the "ultimate question is whether it is possible to select a fair and impartial jury, and in most situations the voir dire examination adequately supplies the facts upon which to base that determination." *Id.* (quoting *United States v. Daddano*, 432 F.2d 1119, 1126 (7th Cir. 1970)).

In his brief, Nettles does not point to any actual prejudice, as he does not identify anything in the record that would indicate any given juror had been exposed to pretrial publicity. Further, he acknowledges that the pretrial publicity in this case was not nearly as pervasive as in other cases in which motions for transfer were denied. Instead, he seems to rely on the idea of presumed prejudice, stating that "juror[s] sitting for a week or more in a building which the government argued was intended to be destroyed by a huge explosion and fire, killing most or all of the persons who worked therein, including jurors, would inevitably have their judgment clouded by that fact." Appellant's Br. at 14.

The district court conducted a careful voir dire process to prevent the presence of juror bias. As we have noted, this approach usually satisfies the "ultimate question" of whether particular jurors can be fair and impartial.[2] However, Nettles argues that the effectiveness of voir dire is irrelevant, because it can only eliminate the taint of pretrial publicity, and here, "the prejudice of the jurors is based on a state of mind which is not nearly as easy to quantify and articulate as a submission of a volume of press clippings would be." Appellant's Reply Br. at 3-4. In other words, unlike in the case of pretrial publicity, here, the "anxiety" of the jurors concerning a potential threat to their own safety made them unable to assess their ability to fairly deliberate and assess the evidence. Nettles argues

---

[2] Only one venire member indicated that he had heard of the case. He was eventually dismissed.

that it was impossible for these jurors "to put out of their mind the inevitable and natural human thought, 'that could have been me working in this building on that day.'" Appellant's Br. at 14. He makes the bold assertion that as a matter of law, it would be impossible for him to be tried by an impartial jury in the Dirksen Federal Building.

Although Nettles effectively distinguishes this type of case from those involving pretrial publicity, it does not necessarily follow that voir dire is a less valuable tool to screen for juror prejudice in this context. The questioning of jurors regarding their ability to be impartial need not be limited to their prior knowledge of the case. Nettles also could have requested that the jurors be asked about their ability to fairly assess evidence pertaining to a threat to the courthouse within which they were sitting, and yet he failed to do so. We find Nettles's full scale attack on our reliance on the voir dire process, based simply on the possibility of "juror anxiety," to be unconvincing.

Nettles relies on the case of *United States v. McVeigh*, 918 F. Supp. 1467 (W.D. Okla. 1996), in support of his claim for a transfer. There are some key distinctions between this case and *McVeigh* that make it inapposite here. First and foremost, McVeigh actually executed his plan to destroy the federal building in Oklahoma City, which, as the district court noted, caused "the deaths of 168 identified men, women and children, injuries to hundreds of other people, the complete destruction of the Alfred P. Murrah Federal Office Building and collateral damage to other buildings, including the United States Courthouse . . . [as well as] immeasurable effects on the hearts and minds of the people of Oklahoma from the blast and its consequences." *Id.* at 1469. In addition to the fact that Nettles was unsuccessful in carrying out his plan, we note that it was entirely impossible for Nettles to destroy the Dirksen Federal Building because (1) every person involved in his plot was an FBI informant, and (2) he was

actually given urea, which does not have the explosive attributes of ammonium nitrate. Perhaps more significantly, *McVeigh* is a district court case, and only represents an example of a district court judge exercising his discretion to grant a change of venue. It offers no support for a reviewing court to reverse a denial of a motion to transfer. Therefore, we do not believe the *McVeigh* case is of much relevance here.

To be sure, the argument that jurors' impartiality would be affected by the fact they sit in the very building that was targeted would indeed be compelling in some instances. However, in this particular case, the alleged facts simply do not compel a finding that, as a matter of law, jurors were prejudiced. As noted above, Nettles's attempted crime was a failure and had a zero percent chance of success given the FBI's involvement. Further, given the improbability of this crime ever coming to fruition, we find that the potential of a juror thinking "it could have been me," would have been just as likely for any juror in any federal courthouse. Admittedly, the facts of this case were enough to convince the prior panel that neither a judge from the Northern District of Illinois, nor a judge from the Seventh Circuit, should hear this case. However, as recorded statements by Nettles reveal, Nettles admitted his desire to kill judges, but not jurors, inside the courthouse. Had Nettles stated that he wished to kill jurors, perhaps our decision would be different.

We reject Nettles's argument that the jury was prejudiced and hold that the district court did not abuse its discretion.[3]

---

[3] Additionally, although this does not affect our determination, we note that Nettles merely moved to transfer to a different district, without suggesting the logical solution of simply transferring his case to the Western Division of the Northern

(continued...)

**IV**

The district court also denied Nettles's motion to sever the counts in the indictment requesting he be tried separately for the charges of attempting to destroy the federal building (Counts 1-3) and the charges related to counterfeiting (Counts 4-9). The district court denied this request, finding that "Defendant's counterfeiting activity was part of a common scheme and plan to destroy the Dirksen building with a truck bomb. Defendant allegedly made clear that counterfeiting would finance his bomb plot." D. Ct. Op., June 29, 2005, at 4. Nettles challenges this ruling on appeal, claiming that the charges regarding the violent crime of attacking the federal building prejudiced him with respect to the charges of the non-violent act of counterfeiting. He also claimed that prejudice occurred in the reverse direction, because he had a prior counterfeiting conviction,[4] and that the jury could have found him

---

(...continued)

District of Illinois. This would have allowed Nettles to be tried in the courthouse in Rockford, Illinois, rather than the Dirksen Federal Building, without having to transfer to another district. At oral argument, Nettles's counsel conceded that this would have been a viable alternative which would have eliminated the need to appeal on this issue. Despite his failure to craft a more particularized motion to transfer, because we find that Nettles was in no way prejudiced by having his trial held in the Dirksen Federal Building, we need not address whether an intradistrict transfer would have been a more appropriate solution.

[4] Although Nettles does not develop this argument with any additional specificity, he seems to be suggesting that evidence of his past convictions for counterfeiting was admissible under Fed. R. Evid. 404(b) with regard to the counterfeiting charges but not to the bombing charges. The government argues that the prior convictions would have been admissible for both offenses, because its theory of the case (supported by statements from

(continued...)

to be more likely to have committed the violent offenses because he was a repeat offender. Nettles's argument consists of two separate legal challenges: first, that joinder was improper under Fed. R. Crim. P. 8(a) because the two alleged crimes were not sufficiently related, and second, that the joinder of the offenses caused him undue prejudice under Fed. R. Crim. P. 14(a).

Rule 8(a) provides that "[t]he indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." We have broadly construed Rule 8(a) "to allow liberal joinder in order to enhance judicial efficiency." *United States v. Stillo*, 57 F.3d 553, 556 (7th Cir. 1995). The question of whether joinder was appropriate under Rule 8(a) is reviewed de novo. *United States v. Archer*, 843 F.2d 1019, 1021 (7th Cir. 1988).

Rule 14(a) states that "[i]f the joinder of offenses or defendants . . . appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." We have held that a "district court's

(...continued)
Nettles) was that Nettles wanted to blow up the courthouse as revenge for his prior counterfeiting convictions. The government is correct, as evidence of past bad acts is admissible under Rule 404(b) to show "proof of motive [or] intent," among other things. Here, Nettles's prior counterfeiting conviction goes directly to his motive. The district court also informed the jury before the trial that the evidence of the prior convictions was only relevant to show "motive, intent, and predisposition," and that it would be "grossly improper to find him guilty in this case because he was found guilty in another case." We find that this was sufficient to eliminate the risk of juror prejudice.

ruling on a Rule 14 severance motion will be reversed only upon an abuse of discretion, [and a defendant] must show that without severance, he was denied a fair trial." *Archer*, 843 F.2d at 1021.

The joinder of Nettles's offenses does not appear to have been improper here. The government's theory of the case was that Nettles's counterfeiting scheme was conducted to financially support his plan to attack the federal building. This theory was backed by evidence that Nettles planned to use counterfeit money or the proceeds from passing counterfeit money to purchase the van and the fertilizer. There was certainly a showing that the separate offenses were "connected with or constitute[d] parts of a common scheme or plan," as required for joinder under Rule 8(a).

Nor does it appear that the district court abused its discretion in determining that Nettles was not significantly prejudiced by the joinder. As Nettles's attorney conceded at oral argument, the offenses were sufficiently intertwined so that the evidence of each offense would have been admissible in a separate trial for the other offense. *United States v. Hogan*, 886 F.2d 1497, 1506 (7th Cir. 1989) ("In determining whether joinder caused the defendant actual prejudice, we determine whether evidence supporting one count could also have been admitted in a trial solely on the other count."). Further, the jury instructions limited any potential prejudice by informing the jury that they could not consider the evidence of prior bad acts for anything other than motive, intent, or predisposition, that the jury should consider the evidence on each count separately, and that a verdict for one offense should not affect a verdict on any of the other charges. There is little basis to conclude that the district court's determination that Nettles would not be prejudiced by the joinder was an abuse of discretion.

Nettles also argues that he suffered sufficient prejudice from joinder because he would have wanted to testify

regarding one alleged offense but not the other.[5] Although in the past we have found a defendant's desire to testify to one offense but not another to be relevant in analyzing a potentially prejudicial joinder, we have held that the "need for severance does not arise 'until the defendant makes a convincing showing that he has both important testimony to give concerning one count and strong need to refrain from testifying on the other.'" *Archer*, 843 F.2d at 1022. Here, Nettles not only failed to make a convincing showing in the trial court that he wanted to testify with regard to the charges relating to destruction of the building, but he failed to raise the issue in the district court at all. Thus, we can disregard Nettles's claim on appeal that he would have wanted to testify in a trial on the bombing counts alone as a basis for finding prejudice.

**V**

We review de novo a district court ruling that affects a defendant's Sixth Amendment rights. *United States v. Danford*, 435 F.3d 682, 687 (7th Cir. 2005). Nettles argues that he was convicted in part upon the audio and video recordings of his conversations with Anicua and "Ali." Nettles contends that because he was not given the opportunity to cross-examine Ali, his Sixth Amendment right to confrontation was violated.[6] He alleges that this prevented him from effectively presenting his entrapment defense. In response, the government contends that there

---

[5] Nettles suggests that he might have wanted to testify with regard to a potential entrapment defense, which he believes would have been more convincing with respect to the terrorism and bombing charges than to the counterfeiting charges.

[6] Nettles concedes that his own taped statements are admissible as party admissions and Anicua's statements are admissible because she was subject to cross-examination.

was no Confrontation Clause violation because Ali's statements were not used "to establish the truth of the matter asserted," and that Ali was not a "witness" for Sixth Amendment purposes. Rather, Ali's statements were merely used as "context" for Nettles's otherwise admissible statements.

*Crawford v. Washington* provides that "[t]he [Confrontation] Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." 541 U.S. 36, 59 n.9 (2004) (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985)). We have read this language to mean that when statements are merely offered to show context, they are not being offered for the truth of the matter asserted, and therefore, *Crawford* does not require confrontation. *United States v. Tolliver*, 454 F.3d 660, 666 (7th Cir. 2006). In *Tolliver*, we examined a nearly identical issue to the one presented in the case at bar: whether the defendant's right to confrontation was violated when the government introduced audiotapes of conversations between the defendant and a confidential informant who did not testify at trial. *Id.* at 664. We ruled that the informant's "statements were admissible to put [the defendant]'s admissions on the tapes into context, making the admissions intelligible for the jury." *Id.* at 666. Applying this rule to Nettles's case, Ali's recorded statements are admissible if they were merely used to provide context to Nettles's admissions.

Despite our holding in *Tolliver*, we implied that our ruling may have been different had the defendant made a showing that the government offered the declarant's statements for the truth of the matter asserted. *Id.* at 666 n.3 ("[The defendant] has not challenged the government's characterization of this evidence, nor has he given us any indication that the government used [the declarant]'s statements for any reason other than to place [the defendant]'s admissions into context."). We note that there is a

concern that the government may, in future cases, seek to admit based on "context" statements that are, in fact, being offered for their truth. Here, however, the record shows that Ali's statements were carefully presented as to only provide context for Nettles's admissions.

Ali presented himself as an individual who had trouble speaking and understanding English, and often asked Nettles to repeat what he said or better explain himself. In many of their discussions, Nettles would do most of the talking while Ali said nothing but "okay" in response. Sometimes, Ali asked questions (presumably in order to elicit more incriminating information from Nettles), such as Nettles's target, or how to make a bomb. However, Ali does not appear to say anything of substance. He does not put words into Nettles's mouth or try to persuade Nettles to commit more crimes in addition to those that Nettles had already decided to commit. In other words, Ali did not actually "testify against" Nettles. *See Crawford*, 541 U.S. at 51 (explaining that the Confrontation Clause "applies to 'witnesses' against the accused—in other words, those who 'bear testimony.'"). Ali was not a "witness" for Sixth Amendment purposes. *See United States v. McClain,* 934 F.2d 822, 832 (7th Cir. 1991). Thus, in this case, the government's characterization of Ali's statements is correct, and they can only be considered contextual. We hold that there was no violation of Nettles's right to confrontation.

**VI**

For the reasons above, we AFFIRM Nettles's convictions.

No. 06-1304                                                                17

A true Copy:

    Teste:


                            _____
                            *Clerk of the United States Court of*
                            *Appeals for the Seventh Circuit*