In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-2495

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

THEODORE HOWARD,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07-CR-674—**Ronald A. Guzman**, *Judge.*

ARGUED MAY 25, 2012—DECIDED AUGUST 22, 2012

Before POSNER, FLAUM, and WOOD, *Circuit Judges.*

FLAUM, *Circuit Judge.* In the summer of 2006, Theodore Howard and Andrea Brown ended their romantic relationship, and Howard was not pleased. Throughout the next year, Howard alternated between attempts to reconcile with Brown and attempts to harm her. He sent letters to Brown begging her to take him back and to allow him to see their son, but he also hired someone to throw acid in her face, surveilled her house, and alleg-

edly paid a man named Telly Virgin to shoot at the METRA train that she operates.

A jury found Howard guilty of hiring Virgin to shoot at a METRA train in an attempt to murder Brown. At trial, the government introduced several pieces of evidence to prove that Howard took repeated actions between the summer of 2006 and the summer of 2007 that were consistent with a motive and intent to harm Brown. Howard claims that this evidence was impermissible under Federal Rule of Evidence 404(b), which prohibits evidence of a defendant's prior bad acts unless the evidence is introduced for a permissible purpose and is not unfairly prejudicial. The district court rejected this argument, and Howard now appeals. In addition, Howard appeals the district court's denial of his motion to empanel a new jury. He contends that the messages from two jurors, which asked the judge why Howard was taking notes during the voir dire discussion of jurors' personal information, indicate that the jury had prejudged him. For the following reasons, we hold that the district court did not abuse its discretion by admitting evidence of Howard's prior bad acts or by declining to empanel a new jury. We affirm the judgment of the district court.

## I. Background

### A. Factual Background

Andrea Brown, an engineer for the METRA Electric Line 601 Train, had dated Howard for many years, begin-

ning in the mid-1980s. For the final seven or eight years of their relationship, Howard and Brown lived together and referred to themselves as husband and wife. Brown has two sons, the younger one fathered by Howard.

In June 2006, Brown informed Howard that she no longer wanted to see him and asked him to move out. Howard reacted poorly—a physical altercation ensued, and Brown filed charges. Brown obtained a protective order, which barred Howard from living with or having any contact with Brown, granted Brown custody of their son, and restricted Howard's visitation rights with their son. In July 2006, Brown obtained a second court order, which required Brown's elder son to be present for any visits between Howard and their son. This order also prohibited Howard from going to Brown's place of employment.

The government put on evidence at trial that Howard began a string of activities during the summer of 2006 aimed at either reconciling with Brown or harming her. The first of these incidents occurred on July 28, 2006, when a man named Ron Windom went to Brown's home on the pretext of offering lawn care services. When Brown opened the door, Windom threw a liquid on her face, exclaiming, "This is for you, bitch." The liquid burned Brown's face and melted her clothes and carpet. Brown claims to have recognized the substance as muriatic acid by its smell, since she and Howard had previously used that substance on their driveway. Windom claims that an African-American man with gray and white hair, whom he had met at a mutual

friend's home, hired him to throw the caustic liquid on Brown in exchange for $50. After receiving a promise not to prosecute, Windom told the police this story and identified a picture of Howard as the man who had paid him to accost Brown. In 2008, Windom again picked Howard out of a photograph lineup.

A few days after the caustic liquid incident, Brown saw Howard as she was driving through her neighborhood. According to Brown, Howard told her: "You better drop them charges or else you know what's going to happen to you." As he said this, he pointed his fingers at her in the shape of a gun.

Despite this alleged aggression, Howard made several attempts to reconcile with Brown between August 2006 and January 2007. He sent her several letters, in which he conveyed his strong feelings for her, requested a reconciliation, and expressed the hurt he felt at not having more time with his son. At the end of August, he placed a call to Brown, which she did not answer. Later that day, Brown noticed Howard walking in her backyard and peeking in her window. Brown also saw Howard on several occasions standing on METRA platforms as she drove the 601 train past him.

In December 2006, Brown had the protective court order against Howard altered to eliminate his visitation rights with their son. Howard nonetheless placed a greeting card and $50 on her door in January, asking her to buy herself something nice and to meet up with him. She did not accept the offer to meet.

In January 2007, Howard was living with his friend, Linda Tigner. At some point, Tigner observed Howard

listening to an audio recording of a female. When she inquired about it, Howard told her that he had tapped Brown's phone and was listening to her calls.

In April 2007, Howard met Telly Virgin, a drug addict and the man who would eventually confess to shooting at the METRA train that summer. They began spending most days together. Howard would drive Virgin to METRA stations where they would sit, as Virgin smoked crack and Howard waited for his "wife" to arrive. Occasionally, Virgin would drop Howard off at a METRA station and pick him up later. Virgin claims that Howard expressed anger toward a man named Chris whom Howard had paid to shoot his wife but instead only shot at her truck. Brown reported this incident to the police after discovering a bullet hole in her car in the movie theater parking lot.

Virgin claims that in May 2007 Howard asked him how much he would charge to kill Howard's wife, to which Virgin named a price of $500. According to the government, Howard next obtained a gun and planned for Brown's murder. Virgin says that, in early June, Howard bought him crack (which he smoked) and took him to the Stewart Ridge METRA station. There, Howard described his plan. Virgin would wait on the platform with the gun and a two-way radio. When Howard notified him that Brown's train was approaching, Virgin would shoot at the passing train and they would escape in Howard's car. They conducted a test run.

Virgin claims that on June 6, 2007, Howard gave him a firearm at the Stewart Ridge METRA station and then

parked the car where Howard could see the tracks. When the 503 train pulled up, Howard advised Virgin that it was not Brown's train. When the next train arrived—the 601 train—Howard told Virgin that it was Brown's train. Virgin fired several shots (allegedly aiming high on purpose), which pierced the outer shell of the train but did not enter the engineer's cab, and then fled. Howard gave Virgin fourteen $10 bags of crack and promised to pay the remainder later. Unbeknownst to them, Brown had switched assignments with another worker and was not working that day.

Howard quickly learned that Brown was still alive so, as Virgin tells it, they tried again. On June 8, 2007, Howard's brother drove Howard's car and took Virgin to the METRA station. The events of June 6 were replicated: Virgin let the 503 train pass, shot at the 601 train, missed (perhaps on purpose) again, and received $20 to $30 worth of crack. Once again, Brown was incidentally absent from her normal train route since she decided to take the day off. Virgin claims that, when Howard discovered that Brown was still alive, he asked Virgin to kill her at her house. Virgin refused.

In July 2007, the car that was allegedly used as the getaway car was impounded. Virgin says that Howard asked him to go into the car to retrieve the gun and two-way radios that were used for the train shootings. Howard gave Virgin a document to get notarized so that Virgin could access the impounded car. The document represented Tigner's authorization for Virgin to retrieve the car, though the government claims that her sig-

nature was forged. Virgin got the document notarized, accessed the car, and removed the gun and radios. Howard put the items into his new car. Virgin claims that he later sold the gun for money and crack.

## B. Procedural Background

Howard was indicted by a grand jury on two counts of each of the following charges: (1) interfering with the engineer of a passenger train, with the intent to endanger the safety of any person and with a reckless disregard for the safety of human life, while the engineer was operating a passenger train that was transporting train company employees, in violation of 18 U.S.C. §§ 1992(a)(6) and (10), 1992(b)(1), and 2 (Counts 1 and 4); (2) committing and attempting to commit an act, namely, the use of a firearm, with the intent to cause serious bodily injury to a train company employee while such person was inside of a passenger train located on tracks used in the operation of a mass transportation vehicle, in violation of 18 U.S.C. §§ 1992(a)(7) and (10), 1992(b)(1), and 2 (Counts 2 and 5); and (3) knowingly using and carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A) and 2 (Counts 3 and 6).

During voir dire, defense counsel warned the venire that the trial would include evidence of "bad acts" that were not part of the criminal charges, and the parties sought to determine whether each prospective juror could remain impartial in the face of these additional "bad

acts." The district court also informed the venire of the presumption of the defendant's innocence. Additionally, during voir dire, jurors were asked several questions relating to their personal information. Howard was taking notes during this process. At the conclusion of voir dire, after fourteen jurors had been chosen, two jurors passed notes to the judge. The first note stated, "Our concerns was the defendant was writing note and watch us all. We did give out a lot of person information." The second note read, "Do we have anything to fear? I couldn't see the defendant however was told that he was taking notes during our interviews, possibly writing our names, which we had to spell, our residences, our children and their ages." Howard argued to the district court (and maintains on appeal) that these notes evidence prejudgment by some or all of the jurors.

In response to the jurors' notes, the district court explained that note-taking was meant to help Howard's defense, that it is a very common practice, and that there was no reason for alarm. Both note-writers were satisfied by this response and confirmed that they did not have any problems. The court reminded the jury of the presumption of innocence, asked the jurors if they had any concerns, and permitted the parties to question the jurors about whether they were afraid or had prejudged Howard. The jurors denied being afraid and explained that their concerns were general and procedural. The court then asked each of the jurors if they could be impartial, and the jurors responded in the affir-

mative. Nevertheless, Howard moved to discharge all of the jurors, which the district court denied.

At trial, the district court admitted several pieces of evidence under Federal Rule of Evidence 404(b) that were offered to prove certain "other acts" committed by Howard. The evidence, the court explained, was not admitted to show that Howard had a propensity to commit bad acts, or any particular bad act, but rather to prove some other matter at issue in the case, such as a possible motive for committing the charged crimes. The court admitted most of the evidence of "other acts." In particular, the district court permitted the government to present evidence of the following: (1) the protective court orders, (2) the caustic liquid incident, (3) Howard's alleged threat to shoot Brown, (4) Howard's surveillance of Brown, including his recording of her phone calls, (5) Howard's hiring of "Chris" to shoot Brown, (6) Howard's supplying crack to Virgin to entice him to shoot Brown, and (7) Howard's recruitment of Virgin to retrieve his gun and two-way radios from the impounded car. The court instructed the jury about the limited uses of this other-acts evidence during voir dire, again when each piece of other-acts evidence was introduced, and again as part of the final instructions.

The jury convicted Howard on all counts. The district court sentenced Howard to life imprisonment, followed by a mandatory consecutive sentence of 35 years' imprisonment. Howard appeals the district court's admission of the "other acts" evidence detailed above, as well as the district court's refusal to empanel a new jury.

## II. Discussion

### A. Rule 404(b) and the Admission of "Bad Acts" Evidence

We review challenges to the district court's evidentiary rulings for an abuse of discretion. *United States v. Long*, 86 F.3d 81, 83 (7th Cir. 1996). In fact, "[t]he district court's evidentiary rulings are afforded special deference and will be reversed 'only where no reasonable person could take the view adopted by the trial court.'" *United States v. Reese*, 666 F.3d 1007, 1015 (7th Cir. 2012) (alteration omitted) (quoting *United States v. Vargas*, 552 F.3d 550, 554 (7th Cir. 2008)).

Rule 404(b) bars the admission of "[e]vidence of a crime, wrong, or other act" that is intended to show the character of a defendant and thereby suggest conformity with such character. FED. R. EVID. 404(b)(1); *see also United States v. Montani*, 204 F.3d 761, 767 (7th Cir. 2000). Nevertheless, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FED. R. EVID. 404(b)(2).[1] We use a four-part test for determining whether a particular piece of other-acts evidence is admissible:

---

[1] We no longer allow proof of other acts that are "inextricably intertwined" with the charged crimes. *See United States v. Gorman*, 613 F.3d 711, 718-19 (7th Cir. 2010). While the government attempted to use this doctrine at trial, the district court did not rely on it when admitting the evidence at issue. Thus, we need not address Howard's arguments regarding this theory.

(1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue; (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act; and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

*Reese*, 666 F.3d at 1015 (quoting *United States v. Baker*, 665 F.3d 677, 681 (7th Cir. 2011)). The final prong of this test incorporates Rule 403's balancing of prejudice and probative value. *See* FED. R. EVID. 403; *United States v. Moore*, 641 F.3d 812, 824 (7th Cir. 2011).

### 1. Purpose for the Other-Acts Evidence

The first prong instructs the district court to consider whether the evidence of the other act is being introduced for a purpose other than to show the defendant's propensity to commit the crime charged. *See Reese*, 666 F.3d at 1015; *see also United States v. Jones*, 389 F.3d 753, 756 (7th Cir. 2004) ("Evidence of prior convictions is not admissible to show a defendant's propensity to commit a crime, nor to show that he or she acted in conformity with that propensity on the occasion in question."). Though Howard does not contend that the other-acts evidence was admitted to show propensity, it is helpful for us to begin by analyzing the purpose that each piece of evidence serves so that we may determine

how probative it is, an important part of the fourth prong of our test.

The district court correctly observed that the protective orders, which prevented Howard from seeing his ex-girlfriend and his son, were strong evidence of a likely motive to kill Brown. The protective orders therefore serve a legitimate non-propensity purpose. Similarly, the caustic liquid incident may aid in proving motive since Howard's decision to hire someone to accost Brown tends to show that he had a reason to harm her. In addition, since specific intent to harm Brown is an element of the crimes charged and the caustic liquid incident is highly probative of Howard's present intent, this incident satisfies the non-propensity purpose of intent. The government met its burden of "affirmatively show[ing] why a particular prior conviction tends to show the more forward-looking fact of purpose, design, or volition to commit the new crime." *Jones*, 389 F.3d at 757.

The next prior bad act—Howard's threat to shoot Brown unless she dropped the charges against him—is powerful evidence of his intent to harm Brown and his motive to kill her. The motive underlying his threat to shoot her is probative of his motive underlying his later decision to kill her.[2]

---

[2] The district court also found the evidence of the caustic liquid incident and of Howard's pantomimed threat to be admissible for the purpose of proving identity. In light of the

(continued...)

The district court properly deemed Howard's surveillance of Brown's home and his recording of her calls as illustrative of his motive and intent to reconcile with Brown, which eventually morphed into anger toward her. Evidence of these other acts is therefore probative of Howard's motive and intent to kill Brown. In addition, the recording of Brown's calls is relevant as evidence of Howard's preparation and planning of the crimes.

Similarly, Howard's hiring of "Chris" to shoot and kill Brown is relevant because it illustrates that Howard had a reason or motive to kill Brown, an intent to kill Brown, and a plan for killing Brown. Further, this plan shares characteristics with the crime charged. Howard's provision of crack to Virgin after the shootings is also probative of the existence of a criminal plan, specifically to reimburse someone for killing Brown. Finally, we agree with the district court that Howard's recruitment of Virgin to retrieve his gun and radios illustrates that Howard had the means and opportunity to have Brown killed, given that he had the tools necessary to conduct the attempted murder.

Because each piece of other-acts evidence disputed by Howard serves a permissible (i.e., non-propensity) purpose, the first prong of the 404(b) framework is satisfied.

---

[2] (...continued)
fact that we have already determined that this evidence was admissible for other purposes, there is no need to discuss its admissibility for the purpose of proving identity.

## 2. Relevance: Time and Similarity

The second prong of our Rule 404(b) test requires that the other act be "similar enough and close enough in time to be relevant to the matter in issue." *Reese*, 666 F.3d at 1015. Howard briefly argues that none of the other acts involved hiring a third party to shoot directly at a person, and thus they are too dissimilar from the crime charged to be relevant. He also argues that the other acts are too removed from the crime temporally, stressing that the chronological beginning of the other-acts evidence—the protective orders—occurred a full year before the train shootings.

The similarity requirement does not require the other acts to be identical to the charged crime. They need only share common characteristics that "relate to the purpose for which the evidence is offered." *Long*, 86 F.3d at 84 (quoting *United States v. Torres*, 977 F.2d 321, 326 (7th Cir. 1992)); *see also Montani*, 204 F.3d at 768 ("[T]he term 'similarity' has been loosely interpreted and loosely applied."). When evidence is presented to show intent, "[s]imilarity is relevant only insofar as the acts are sufficiently alike to support an inference of criminal intent. . . . The prior acts need not be duplicates of the one for which the defendant is now being tried." *Reese*, 666 F.3d at 1015 (quoting *United States v. Lloyd*, 71 F.3d 1256, 1265 (7th Cir. 1995)) (emphasis omitted). Howard's payments to Windom to throw acid on Brown and to "Chris" to shoot Brown are certainly similar enough to show that Howard had the intent to harm Brown then and at the time of the train shootings.

Further, the acts of recording Brown's phone calls and surveilling her house are sufficiently similar to the charged crime because they share the characteristic of demonstrating Howard's obsession with Brown.

Where evidence is not introduced to show intent or knowledge, the similarity inquiry essentially insures that the crime charged and the other-act evidence are sufficiently related through the 404(b) purpose for which the other-acts evidence was introduced. *See* WEINSTEIN'S FEDERAL EVIDENCE § 404.21 (2012) ("To establish that the defendant is sufficiently connected to the other act or offense, some circuits expressly require that the other act or offense be similar and close in time to the charged offense, especially if the evidence is directed to the consequential fact of intent or knowledge."). Because we determined in the preceding section that the other-acts evidence were highly probative for the purposes for which they were introduced, no further analysis is necessary here.

Howard's argument that the other acts are not close enough in time to be relevant also fails. "The analysis of 'how long is too long' is a flexible one, and the answer depends on the theory for which the evidence is offered." *United States v. Ruiz*, 178 F.3d 877, 880 (7th Cir. 1999) (citing *Torres*, 977 F.3d at 326). The mere fact that some of the other acts are one year apart from the crime charged does not, by itself, preclude their use. *See United States v. Kreiser*, 15 F.3d 635, 640 (7th Cir. 1994) (determining that seven years is "close enough" to be relevant). Here, the protective orders are the acts most

temporally removed from the train shooting. The district court deemed these relevant because they remained in effect through the time of the shooting. Howard nonetheless argues that these acts, along with several of the other acts, are too far removed because they do not explain why he would not have attempted to shoot Brown earlier, closer to the issuance of the protective orders. The district court rejected this argument, reasoning that the government had established Howard's ongoing obsession with Brown and his vacillation between wanting Brown back and being violently angry at her refusal to take him back. Since all of the other acts mentioned above fit neatly within this narrative, the district court did not abuse its discretion by deeming those acts sufficiently close in time to be relevant to the matter at issue.

### 3. Sufficiency of Evidence

Howard next argues that the evidence used to prove the other acts at issue was not sufficient for a jury to find that he was the one who committed those other acts. Rule 404(b) evidence "is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor." *United States v. Heath*, 188 F.3d 916, 921 (7th Cir. 1999) (quoting *Huddleston v. United States*, 485 U.S. 681, 689 (1988)). We must therefore determine whether there is enough evidence such that a jury could have reasonably concluded that the other acts took place and that they were undertaken by Howard.

Howard first attacks the sufficiency of the other-acts evidence by calling into question Virgin's testimony in support of Howard's hiring of "Chris" to shoot at Brown, Howard's payment of crack to Virgin for shooting at the train, and Howard's request for Virgin to retrieve his gun from the impounded car. Howard claims that Virgin's testimony contains contradictions and is uncorroborated, that Virgin received a plea deal in exchange for testifying, and that Virgin is a crack addict with a criminal record. Thus, Howard contends, Virgin's testimony cannot serve as the foundation for any prior bad acts. We have previously explained, however, that eyewitness testimony does provide a foundation for a reasonable finding by the jury. *See Long*, 86 F.3d at 85. Virgin's credibility may not be strong, but "[c]redibility determinations are left to the jury . . . especially where the witness was thoroughly cross-examined." *Id*. Moreover, Virgin's testimony was in fact corroborated. His testimony regarding Howard's admissions about the "Chris" incident is corroborated by the fact that there was a bullet hole in the car and that Brown reported the incident to the police. Virgin's testimony about the exchange of drugs for shooting at the train is corroborated by the absence of any other logical reason for Virgin to shoot at a random train or at a stranger. Finally, Virgin's testimony about being asked by Howard to retrieve items from the impounded car using a letter from Tigner is corroborated by the fact that Tigner is the true owner of Howard's car. The district court, therefore, did not abuse its discretion by finding that a reasonable jury could have relied on Virgin's testimony

for the establishment of certain other acts committed by Howard.

Howard next challenges the testimony of Windom (the acid-thrower) and Brown. The fact that both Windom and Brown testified to witnessing some of the other acts is enough for a reasonable jury to believe that those acts occurred. Further, there is no reasonable explanation for why Windom would throw acid at a stranger other than the explanation provided during trial. Moreover, most of Windom's and Brown's testimony is corroborated by other evidence. Windom's testimony is corroborated by his ability to pick Howard out of a lineup. Brown's testimony about the window-peering incident is corroborated by Howard's own admissions in a separate court proceeding. Her testimony about Howard's pantomimed threat was corroborated by Virgin's testimony, which suggests that Howard did actually try to have Brown shot.

In sum, the evidence is certainly sufficient for a reasonable jury to find that the other acts at issue occurred, and thus the district court did not abuse its discretion.

### 4.  Probative Value vs. Prejudicial Effect

The final prong of the Rule 404(b) test requires that "the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice." *Reese*, 666 F.3d at 1015. The concern with 404(b) evidence is that jurors will decide that a defendant is guilty because they believe that he has a propensity for committing

the charged crime or that he simply has a bad character, making him more likely to commit crime in general. When balancing prejudice against probative value, it is important to keep in mind that all relevant evidence is prejudicial and that evidence must be *unfairly* prejudicial in order for it to be inadmissible under this prong. *See Long*, 86 F.3d at 86. We have explained that "[e]vidence is unfairly prejudicial only to the extent that it will cause the jury to decide the case on improper grounds*." United States v. Chavis*, 429 F.3d 662, 668 (7th Cir. 2005) (quoting *United States v. Jones*, 248 F.3d 671, 676 (7th Cir. 2001)). One way in which 404(b) evidence can be unfairly prejudicial is by being cumulative, thereby negating its probative value while retaining its prejudicial effect. *See United States v. Ciesiolka*, 614 F.3d 347, 357-58 (7th Cir. 2010); *see also* FED. R. EVID. 403.

Howard argues that the "minimal" probative value of the 404(b) evidence admitted was substantially outweighed by its prejudicial effect. He broadly claims that the other-acts evidence suggested that he was a drug dealer, a forger, a vandal, an eavesdropper, a stalker, and a wife beater, making the jury likely to convict him based solely on the fact that he is a "bad guy." We disagree and conclude that the district court did not abuse its discretion in determining that the probative value of the 404(b) evidence was not substantially outweighed by any prejudicial effect.

Even if the 404(b) evidence left the jury with the impression that Howard wanted to kill Brown, had a plan to kill Brown, or had the intent to kill Brown, that effect

stems from proper uses for the evidence and thus enhances its probative value. The jury's conclusions flow logically from the admissible purposes of the other-acts evidence, rather than from an abstract belief that Howard is a bad person who commits crimes and thus must have committed this attempted murder.

Further, the district court minimized the danger of unfair prejudice by implementing several prophylactic measures. During voir dire, the court emphasized that "[t]he defendant is charged with certain crimes and it is those crimes and those crimes only that you are to consider in deciding whether he's guilty or innocent. What kind of person he is doesn't matter." Before trial, the district court also cautioned the jury that if it is instructed that some item of evidence is received for a limited purpose only, it must follow that instruction and consider the evidence only for that limited purpose. The court repeated this limiting instruction when each piece of other-acts evidence was presented and once more during the court's final instructions prior to the deliberation. Absent evidence to the contrary, "we assume that limiting instructions are effective in reducing or eliminating unfair prejudice." *Vargas*, 552 F.3d at 557. Here, there is no indication that the jury could not or did not follow the limiting instructions.

We therefore hold that the district court did not abuse its discretion in admitting the other-acts evidence under Rule 404(b).

**B. The Denial of Howard's Motion to Empanel a New Jury**

We review a district court's decisions concerning jury impartiality for an abuse of discretion. *United States v. McClinton*, 135 F.3d 1178, 1186 (7th Cir. 1998). "The decision whether to dismiss any or all jurors lies in the sound discretion of the trial judge," and we will only reverse that decision if "manifest injustice resulted from the judge's refusal to dismiss all of the jurors." *United States v. Lott*, 442 F.3d 981, 984 (7th Cir. 2006) (quoting *United States v. Jones*, 696 F.2d 479, 492 (7th Cir. 1982)).

Howard argues that the two juror notes, relaying the jurors' concern about Howard's note-taking during voir dire, indicate that the jury was afraid of Howard and thus prejudged him. Though Howard acknowledges that remedial measures were taken, he suggests that more should have been done, especially since one juror still seemed "angry" when asked about her note. He concedes that the jurors claimed to be impartial, but he contends that their actions suggested otherwise. We cannot accept Howard's claims.

As an initial matter, neither note conveyed that anyone was afraid of the defendant: one note simply expressed "concerns," and the other asked whether the jurors *should* be afraid. In *United States v. McAnderson*, a juror asked if the jurors taking public transportation could be walked to the bus depot, given the severe accusations in the case. 914 F.2d 934, 943 (7th Cir. 1990). We held that the note "does not in any way demonstrate that the defendants' jury was less

than fair and impartial," and we observed that the use of the term "accusations" instead of "crimes" indicated that the jurors were sufficiently impartial. *Id*. Similarly, the jurors in this case all confirmed that they had not prejudged the defendant, and the jurors who had written the notes clarified that they were concerned with the procedure and were not afraid of the defendant. Further, the district court took several remedial steps to insure that the jury had not prejudged Howard. The court explained the importance of note-taking, questioned the jurors individually, asked the notes' authors whether they were afraid of Howard, and allowed the parties to question the jurors. The jurors individually confirmed that they had not prejudged Howard. "[W]e credit jurors' affirmation of impartiality, [a]bsent any reasons to suspect as untrue the jurors' claims of ability to remain impartial . . . ." *Lott*, 442 F.3d at 984 (quoting *United States v. Moutry*, 46 F.3d 598, 603 (7th Cir. 1995)). Finding no reason to question the jurors' claims of impartiality, we hold that the district court acted well within its "sound discretion" when it denied Howard's motion to empanel a new jury.

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.