In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-1321

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RANDALL B. CAUSEY,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 10-CR-88 — **Rudy Lozano**, *Judge.*

ARGUED NOVEMBER 8, 2013 — DECIDED MARCH 28, 2014

Before POSNER, ROVNER, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Randall Causey was part of a conspiracy that preyed on novice real estate investors during the housing bubble in 2005–06, defrauding both borrowers and lenders alike. A five-day trial revealed that Causey and his co-conspirators would do just about anything to complete a sale and make a profit, whether it was making promises they had no intention of keeping or falsifying receipts, incomes or other information on loan forms. Causey, who

was the only co-conspirator that did not plead guilty, was convicted and sentenced for his role in the fraud.

Causey raises five issues—four evidentiary and one sentencing—on appeal. First, he argues the court improperly admitted irrelevant and prejudicial photographs taken of the houses around the time of trial rather than at the time of the sale. We reject this argument because the photographs gave the jurors a sense of the size, location and style of the house, and the jurors were repeatedly reminded when the pictures were taken. Second, evidence of a fraudulent sale that took place outside of the conspiracy was properly admitted because Causey placed his intent to defraud and knowledge of the fraudulent scheme at issue by claiming he was an innocent pawn, and this sale demonstrated his fraudulent knowledge and intent. Third, a defense witness's testimony was properly excluded as undisclosed expert testimony because the witness had no personal knowledge of the transactions at issue and was asked instead about industry norms, which is only permissible if a witness is qualified as an expert. Fourth, Causey argues the district court erred in allowing an unqualified co-conspirator to give broad expert testimony and allowing her to testify as both a fact and expert witness without a limiting instruction. Since the witness was never referred to as an expert in front of the jury, there was extensive cross examination about her credentials and the basis for her opinion, and her opinion was not significant to the government's case, we reject Causey's arguments. Finally, a two-level sentencing enhancement for being an "organizer, leader, manager, or supervisor of the conspiracy" was properly assessed because Causey was responsible for recruiting the buyers into the conspiracy and exercised control over them during their involvement, which included submit-

ting fraudulent paperwork during closings, and some buyers were also uncharged criminally responsible parties.

We affirm the district court on each of these issues.

## I. BACKGROUND

Sheila Chandler learned how to falsify documents and close fraudulent loans as a mortgage broker in Gary, Indiana. She became familiar with the Gary real estate market, including a house's actual value, and, more importantly for her purposes, what the house would appraise for after a little cosmetic work. Sensing an opportunity, she devised a scheme to defraud both lenders and buyers. As part of that scheme, she approached Gordon Rainey in 2005 and suggested he start a construction company to make minimal changes to the houses and then charge inflated amounts that would be pocketed at closing. Defendant Randall Causey was living at Rainey's house at the time and asked if he could be involved, and Causey and Rainey subsequently co-founded and jointly owned a construction company called Netlink. With that, the conspiracy was off and running. By the time the three were arrested, they had executed the mortgage scheme twenty-five times between July 2005 and August 2006 in and around the Gary area.

The scheme worked as follows: First, the group needed buyers who were real estate novices. Causey used charm and false promises to recruit five of the seven buyers who purchased eighteen of the twenty-five Gary properties listed in the indictment. With a buyer in place, Chandler would fill out a mortgage application, falsifying income, down payments and any other information to make the buyer a viable loan candidate. She would then order appraisals, title work,

and pre-approval from the lender. The conspirators would use "trainee" appraiser Henry Sterk to appraise most of the houses at a greatly inflated price. The next step was to close on the house. Chandler gave false information to the lenders on the HUD-1 statements, which itemize all charges imposed upon a borrower and seller for the transaction. Once the amounts on the HUD-1 were paid, the title company told Chandler how much remained of the loan. Chandler then made up false construction invoices for that remainder. After the closing, the conspirators divvied up the money paid for the false invoices. Chandler received $2,000 cash per house, while Causey received somewhere between $3,000 and $5,000.

Causey was directly or indirectly responsible for recruiting five of the buyers, but we highlight the experiences of two purchasers relevant to the appeal, Beatrice Mengich and Toi Lisa Mark. Beatrice Mengich was brought into the scheme by her aunt, Lillian Kimutai, who met Causey on a singles telephone line. After Kimutai bought into Causey's sales pitch, but before she realized she had been defrauded, Kimutai recommended to Mengich that Mengich also invest in Gary real estate. It was not until Mengich, at twenty-three years old, was flown up from North Carolina to Northwest Indiana for the closing that she learned for the first time that arrangements had been made for her to buy four houses rather than one, as she had previously been told.

Toi Lisa Mark was originally from Gary and had a mutual friend with Causey named George Hawkins. Hawkins suggested Mark invest with Causey. Like with other buyers, Causey told Mark that if she bought houses, he would fix them up, Netlink would handle all the property manage-

ment issues, and she could rent out the houses. Causey said he was looking out for her because of their mutual friend, and promised her at least $7,000 cash back. Mark eventually bought two houses in May 2006, sight unseen. At the closing, Mark pointed with concern to the paperwork showing that she made a "major down payment," which she knew she had not, and Causey responded that he had taken care of it. Once Mark purchased the home, Causey became non-responsive.

As the scheme with Chandler and Rainey was winding down, Causey began recruiting buyers for a different scheme he was running with one of Chandler's former coworkers. One of those buyers was Kristen Dudley who bought a house in November 2006 when she was eighteen years old, sight unseen. When Dudley reached out to Causey later, he stopped taking her calls.

Ultimately, the authorities figured out the scheme and a grand jury returned a nine-count indictment against Causey, Chandler and Rainey, among others. They were charged with conspiring to commit wire fraud in violation of 18 U.S.C. § 1349, and eight counts of aiding and abetting the commission of, and committing the offenses of, wire fraud in violation of 18 U.S.C. § 1343. All except Causey pled guilty.

At trial, the government introduced twenty-five group exhibits of pictures of the properties taken between 2009 and 2012. The jury was repeatedly reminded that the photographs represented the houses near the time of trial and not how they appeared at the time of the conspiracy.

The government called Chandler to testify about her role in the fraud. She had also been disclosed before trial as a po-

tential expert on real estate closings. Chandler testified about the market conditions in Gary, at one point saying the Gary housing market was inflated by 400%. Defense counsel did not object to this estimate, but cross examined Chandler extensively about her qualifications to give such an opinion and regarding the facts on which that opinion was based.

The government also called Mark, Mengich and Dudley to testify about their purchases. Defense counsel objected to Dudley's testimony as improper under Federal Rule of Evidence 404(b), arguing it was propensity evidence. The district court allowed the testimony, reasoning that it went to intent, knowledge, and absence of mistake and that the probative value was not substantially outweighed by the prejudicial value.

Once the government rested, defense counsel called Douglas Kvachkoff, the owner of the Indiana Title Network Company. He began to testify as to the contents of a closing folder he had with him, but when Kvachkoff admitted that he "did not personally obtain the funding number" on the folder and defense counsel began asking about how someone in the industry would get a funding number, the court barred the responses as improper expert testimony. Defense counsel proffered that Kvachkoff would have testified that a funding number is issued by lender once it has reviewed the settlement statement (*e.g.*, the HUD-1) and is a necessary precondition for the disbursement of the loan.

The jury returned a verdict finding Causey guilty on all counts. At sentencing, the judge adopted the Presentence Investigative Report prepared by the Probation office, and applied a two-level enhancement under United States Sentencing Guidelines ("U.S.S.G.") § 3B1.1(c) for Causey's role as an

"organizer, leader, manager, or supervisor of the conspiracy." Causey objected, arguing that he was only a minor participant and instead deserved a two-level reduction. The district court found that the two-level enhancement was proper because Causey was a major player in the crime and sentenced Causey to 108 months' of imprisonment to be followed by three years supervised release.

This appeal follows.

## II. ANALYSIS

### A.  Evidentiary Rulings

Causey challenges four evidentiary rulings by the district court. We review the decision to allow or exclude evidence for an abuse of discretion. *United States v. Garcia-Avila*, 737 F.3d 484, 490 (7th Cir. 2013). "The district court's evidentiary rulings are afforded special deference and will be reversed 'only where no reasonable person could take the view adopted by the trial court.'" *Id.* (quoting *United States v. Reese*, 666 F.3d 1007, 1015 (7th Cir. 2012)). "Even when an abuse of discretion occurs, however, reversal only follows if admission of the evidence affected the defendant's substantial rights." *Id.* (quoting *United States v. Richard*, 719 F.3d 746, 758 (7th Cir. 2013)). We ask "whether an average juror would find the prosecution's case significantly less persuasive without the improper evidence." *Id.* (quoting *United States v. Miller*, 673 F.3d 688, 700 (7th Cir. 2012)).

### 1.  No Abuse of Discretion in Admitting the Photographs

Causey argues that the district court improperly admitted irrelevant and overly prejudicial photographs of the homes because they were taken between three and six years

after the conspiracy ended. "To be relevant, evidence need not conclusively decide the ultimate issue in the case, nor make the proposition appear more probable, but it must in some degree advance the inquiry." *Thompson v. City of Chi.*, 472 F.3d 444, 453 (7th Cir. 2006) (internal citations omitted); *see* Fed. R. Evid. 401. While there is a question as to whether defense counsel preserved proper objections to all the exhibits—and therefore whether the plain error or abuse of discretion test applies—it does not affect our analysis because these photographs were relevant under either test. *See United States v. Cheek*, 740 F.3d 440, 447 (7th Cir. 2014) (applying plain error test when no timely objection). Although the photographs were taken after the conspiracy was over, they were relevant because they presented the jury with the layout, size, location and composition of the houses, and also aided various witnesses in explaining their experiences. That is enough to advance the inquiry.

Causey's Rule 403 argument is stronger, but fails because any potential prejudice was mitigated by the parties' actions. Causey argues that the photographs were prejudicial because they showed the houses in various states of disrepair and therefore would have given the jury a distorted perception of the houses' worth, which he claims is an important factor when the government argues the estimates were inflated. Federal Rule of Evidence 403 permits the court to exclude otherwise relevant evidence "if its probative value is substantially outweighed by a danger of … unfair prejudice, confusing the issues, [or] misleading the jury … ." Fed. R. Evid. 403. Here, there was little, if any, prejudice, and certainly not enough to substantially outweigh the pictures' probative value. The government said in its opening statement, and the photographer reiterated during direct and

cross examination, that the photographs were taken around the time of the trial; the government introduced a chart, without objection, detailing which photos were taken and when; and various witnesses testified to the differences between the houses as depicted in the photographs and the houses when purchased. Any prejudice or danger of misleading the jury was mitigated by these and numerous other reminders that the photographs depicted the houses around the time of trial and not near the time of the sale.

We understand from statements the government made at oral argument that at least one mitigation effort, the chart, was necessary because jurors were not allowed to take notes during trial. While the decision whether to allow jurors to take notes remains in the discretion of the trial court, *see SEC v. Koenig*, 557 F.3d 736, 742 (7th Cir. 2009), we have consistently encouraged the practice of allowing jurors to take notes and have acknowledged as much by incorporating the practice into the Seventh Circuit Pattern Criminal Jury Instructions. *See* 7th Cir. Pattern Criminal Jury Instruction No. 3.18 (2012 ed); *see also, e.g., United States v. McGee*, 612 F.3d 627, 633–34 (7th Cir. 2010) (stating that taking notes is one way to avoid jurors' attention and memories from waning); *Moore v. Knight*, 368 F.3d 936, 941 (7th Cir. 2004) (reversing denial of writ of habeas corpus and noting that jurors' faulty memories could have been influenced, in part, by their inability to take notes at trial). A judge would not try a bench trial without the ability to take notes, even though the trial transcript can be generated post-trial. It is difficult to understand why jurors should not have the same opportunity to take notes.

### 2.  No Abuse of Discretion in Admitting Dudley Transaction

Next, Causey argues that the district court erred by admitting evidence of the Dudley transaction, a house sale which occurred after the conspiracy with Chandler and Rainey had ended. Causey argues that this transaction was used to show he had a propensity to commit fraud and therefore should have been excluded under Federal Rule of Evidence 404(b).

While evidence of another "bad act" is "not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," it is admissible to prove motive, opportunity, preparation, plan, knowledge, identity, absence of mistake, lack of accident, or intent. Fed. R. Evid. 404. We have previously used, and the district court applied, a four-part test which states that Rule 404(b) evidence is admissible if: (1) the evidence is directed towards establishing a matter other than the defendant's propensity to commit crimes charged; (2) the other act is similar and close enough in time to be relevant; (3) the evidence is sufficient to support a jury finding that the defendant committed the other act; and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. *See, e.g., United States v. Torres-Chavez*, ____ F.3d ___, 2014 U.S. App. LEXIS 4229, at *6 (7th Cir. 2013).

Causey's defense at trial was that Chandler and Rainey were the masterminds of the conspiracy and that he was a pawn who did not know that he was part of a fraudulent scheme. The government sought to introduce evidence of the Dudley transaction to show that Causey spearheaded anoth-

er fraudulent scheme without Chandler and Rainey and that he knew what he was doing when he entered into the mortgage operation with Chandler and Rainey. While the line between propensity and intent/knowledge can sometimes be blurry, the Dudley transaction was directly relevant to whether Causey intended to defraud the buyers in the Chandler and Rainey scheme and whether Causey knew of the scheme's fraudulent nature. *See, e.g., Jannotta v. Subway Sandwich Shops, Inc.*, 125 F.3d 503, 517 (7th Cir. 1997) (affirming decision to admit evidence of other fraudulent statements made outside of the alleged fraud).

Moreover, the Dudley transaction was sufficiently similar to those in the Chandler and Rainey conspiracy to demonstrate Causey's knowledge and fraudulent intent. While Causey highlights ways in which the Dudley transaction was different—no falsified financial forms or promises to find tenants or give cash back—"[w]hen evidence is presented to show intent, '[s]imilarity is relevant only insofar as the acts are sufficiently alike to support an inference of criminal intent.'" *United States v. Howard*, 692 F.3d 697, 705 (7th Cir. 2012) (quoting *United States v. Reese*, 666 F.3d 1007, 1015 (7th Cir. 2012)). Both schemes involved Causey's recruitment of novice female buyers, false promises, purchases without seeing the houses, and Causey cutting off communication with the buyers shortly after the closings. Additionally, the Dudley recruitment began six months after Causey recruited Mark, which we have previously found is close enough in time to permit the introduction of 404(b) evidence. *See, e.g., United States v. Chapman*, 692 F.3d 822, 827 (7th Cir. 2012) (finding two years close enough in time to admit Rule 404(b) evidence); *United States v. Kreiser*, 15 F.3d 635, 640 (7th Cir. 1994) (seven years); *Howard*, 692 F.3d at 705–06 (over one

year). Because the characteristics of the schemes were sufficiently alike, they support an inference of criminal intent.

Next, Dudley and the seller both testified as to Causey's role in the fraudulent transaction, which is sufficient evidence to show he committed the act. *Howard*, 692 F.3d at 706 (finding witness testimony sufficient).

Finally, an act demonstrating Causey's intent and knowledge was especially probative given that the government needed to prove both to prevail on its causes of action. *United States v. Anderson*, 580 F.3d 639, 646 (7th Cir. 2009) (noting 18 U.S.C. § 1343 wire fraud requires proof that defendant "knowingly participated in a fraudulent scheme with the specific intent to deceive or cheat the scheme's victims" and conspiracy requires proof that defendant "knew of the essential nature and scope of the charged conspiracy and that he intended to participate in it"). Causey himself made the Dudley transaction even more probative when he put his intent at issue by claiming he was an innocent pawn in Chandler and Rainey's game. *United States v. Miller*, 673 F.3d 688, 697 (7th Cir. 2012) ("[E]vidence tending to prove intent becomes more probative [] when the defense actually works to deny intent"); *see also United States v. Stokes*, 726 F.3d 880, 896 (7th Cir. 2013). While the probative value was high, there was minimal prejudice because the testimony was a brief part of the trial, it did not describe any details about Causey that had not already been discussed, and the district court "alleviated any unfair prejudice by giving a limiting instruction." *United States v. Moore*, 531 F.3d 496, 500 (7th Cir. 2008). The admission of the Dudley transaction was not an abuse of discretion.

### 3. Kvachkoff's Expert Testimony Was Properly Barred

Causey argues that the district court erred by barring Kvachkoff's testimony as expert opinion testimony that was not disclosed in Causey's pretrial Federal Rule of Criminal Procedure 16 notice. Testimony that is based on "scientific, technical, or other specialized knowledge" is expert testimony, Fed. R. Evid. 702, a written summary of which must be disclosed pretrial in a criminal case when certain conditions are met. Fed. R. Crim. P. 16(b) (defendant must provide expert summaries when government first discloses its summaries and requests defendant's). Causey admits he did not disclose Kvachkoff's testimony before trial, but argues he did not need to because it was not expert testimony.

Causey is correct that Kvachkoff began as an occurrence witness when he testified as to the contents of a folder sitting on his lap. But once Kvachoff said he had "no recollection of this closing" referred to on the folder and defense counsel began asking about industry practice for procuring closing numbers, the testimony crossed into expert testimony. *See* Fed. R. Evid. 702; *United States v. Pansier*, 576 F.3d 726, 737–38 (7th Cir. 2009) (finding testimony about the characteristics of forged banking forms to be expert testimony). These questions required testimony based on "specialized knowledge" of the industry and therefore necessitated expert opinion. Because Causey admittedly did not file the required Rule 16 disclosure, the district court was within its discretion to exclude the expert testimony. *See* Fed. R. Crim. P. 16(d)(2)(C) (noting that if a party fails to comply with Rule 16's disclosure requirements, the court may "prohibit that party from introducing the undisclosed evidence"); *United States v. Hof-*

*feckner*, 530 F.3d 137, 185 (3d Cir. 2008) ("Courts of appeals have upheld the exclusion of experts [under Fed. R. Crim. P. 16] when defendants fail to serve timely notice of their intent to call them as witnesses.").

### 4. Admission of Chandler's Expert Testimony Was Harmless Error

Next Causey argues the district court erred in allowing Chandler to testify as an expert. He specifically challenges her statement that the Gary housing market was inflated by 400%, and he contends that the court erred in letting her testify in a dual expert/lay testimony capacity without a limiting instruction.

The parties dispute the proper standard of review. Causey claims we should review for abuse of discretion because counsel objected to the foundation of Chandler's opinions, whereas the government claims we should review for plain error because no objection was raised about Chandler's qualifications as an expert or, specifically, the 400% question and answer. We need not make this determination because the argument ultimately fails under either standard since any error that might have been made in admitting this testimony was harmless. *See Cheek*, 740 F.3d at 450 (analyzing for harmless error under plain error review); *United States v. York*, 572 F.3d 415, 429 (7th Cir. 2009) (analyzing for harmless error under abuse of discretion review). The test for harmless error is "whether, in the mind of the average juror, the prosecution's case would have been 'significantly less persuasive' had the improper evidence been excluded." *York*, 572 F.3d at 429 (internal quotations omitted).

Causey argues that Chandler was not qualified to give expert testimony and the 400% comment was beyond the scope of the government's pretrial Rule 16 disclosure, which said Chandler would testify about the process for real estate closings. Even if it was an error to admit Chandler's testimony and even if such testimony exceeded the scope of the government's disclosure, the error was harmless. Chandler's expert testimony was of little value to the government's case. The government had to prove that the co-conspirators defrauded purchasers with false promises and defrauded lenders with false information. Chandler's occurrence testimony went to these facts. However, the extent to which the housing market in Gary was inflated was beside the point; the 400% estimate was only relevant to explain how profitable the scheme was because the higher the appraisal, the higher the loan, and the more wiggle room there was to submit false invoices. The government did not even mention the 400% figure in its closing.

Moreover, the government's case was so strong without Chandler's expert testimony that we cannot find that the prosecution's case would have been "significantly less persuasive" had it been excluded. *Id*. The government put on testimony from Causey's co-conspirators who described Causey's involvement in the scheme, along with witnesses and purchasers who had been defrauded, and it presented physical evidence that showed the extent and nature of the conspiracy.

Additionally, any potential harm by the error was mitigated by defense counsel's thorough cross examination of Chandler regarding her qualifications. Defense counsel pointed out that Chandler was not an appraiser, had done no

time span analysis, and had never compared the Gary market to other areas. This reduced the chance that the jury would attach undue weight to Chandler's testimony. Admitting Chandler's expert testimony, and specifically the 400% comment, was therefore harmless error.

Finally, Causey's argument that the district court erred in allowing Chandler to testify in a dual capacity fails. The district court did not err in its handling of such testimony because even if Chandler was an expert, it is unlikely that any juror would have been confused by such testimony since the court took "precautions to ensure the jury [understood] its function in evaluating this evidence." *Id.* at 425. The government "did not explicitly present [Chandler] to the jury *as an expert*. Consequently, there was little risk that the jury might have been confused by [Chandler's] 'dual roles' as both an expert and lay witness, that [her] status as an expert might overawe the jury, or that the jury might have mistakenly believed that [her] expert opinions were based on facts about the defendant not presented at trial." *Cheek*, 740 F.3d at 450 (emphasis in original). Other precautionary measures included the government's foundational question—"[w]hat information did you need to make that assessment"—and defense counsel's thorough cross examination. *York*, 572 F.3d at 425 (finding "government's establishing the proper foundation for the witness's expert opinions and the district court's allowing the defense to rigorously cross-examine the expert" constituted precautions). While a limiting instruction is one way to ensure the jury understands how to properly evaluate the evidence presented, it is not the only way. Here, such instruction was not necessary because there were adequate precautionary measures already in place.

Even if we assume admitting Chandler's expert testimony was admitted in error, we need not address Causey's argument that he was prejudiced by cumulative trial error because "we find that [defendant] did not identify more than one error, [and so] the cumulative error doctrine does not apply." *United States v. Moore*, 641 F.3d 812, 830 (7th Cir. 2011). We affirm the district court's evidentiary rulings.

## B. No Error in Applying Two-Level Sentencing Enhancement

Lastly, Causey argues that he did not qualify for the two-level sentencing enhancement under U.S.S.G. § 3B1.1(c) because he was not an "organizer, leader, manager, or supervisor" of the conspiracy. We disagree.

We review the district court's application of the Sentencing Guidelines de novo and its findings of facts for clear error. *United States v. Harmon*, 721 F.3d 877, 887 (7th Cir. 2013). "Factual findings are overturned 'only if our review of all the evidence leaves us with the definite and firm conviction that a mistake has been made.'" *Id.* (quoting *United States v. Bennett*, 708 F.3d 879, 888 (7th Cir. 2013)). We may affirm the application of U.S.S.G. § 3B1.1 on any grounds that are supported by the record. *United States v. Fox*, 548 F.3d 523, 529 (7th Cir. 2008).

Section 3B1.1(c) of the Sentencing Guidelines allows for a two-level enhancement "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity." U.S.S.G. § 3B1.1(c). The "defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." U.S.S.G. § 3B1.1 cmt. n.2. A "participant" is a "person who is criminally responsible for the commission of

the offense, but need not have been convicted." *Id.* at cmt. n.1.

Causey argues the enhancement was improper for three reasons: (1) he only recruited three of the seven buyers; (2) the district court improperly considered whether he was "essential" to the offense; and (3) the enhancement requires that a defendant exercise control over at least one other participant in the scheme, and Causey did not. First, the district court did not err in finding that one of the factors that made Causey an "organizer, leader, manager, or supervisor" was that he recruited Mark and Mengich, in addition to the three other buyers he admitting to recruiting. U.S.S.G. § 3B1.1 cmt. n. 4 (noting "recruitment of accomplices" and "degree of participation in planning or organizing the offense" are factors to consider when determining if someone is a leader or organizer); *United States v. Robertson*, 662 F.3d 871, 878 (7th Cir. 2011) (finding recruitment of charged and uncharged buyers in fraudulent real estate scheme supported application of the enhancement). While Hawkins re-introduced Mark to Causey, Mark made it clear that Causey brought her into the scheme, told her what the business proposal was, what role she would play, how she would receive a kickback, and how Netlink would rehabilitate the house. It was not clear error to find that Causey recruited Mark into the scheme. Furthermore, while Lillian introduced Mengich to the scheme, there are two facts that weigh heavily against Causey's argument that he did not recruit Mengich. He introduced Lillian to the scheme and therefore indirectly caused Mengich to become part of the conspiracy. More tellingly, Causey believed he was owed money as a result of the Mengich purchase, thereby taking credit for the sale. This demonstrates that Causey himself believed that he brought

Mengich to the scheme. It was not plain error to find that Causey recruited both Mark and Mengich, and therefore to find him responsible for five of the seven buyers.

Causey next argues that the district court's finding that Causey was "essential" to the scheme contravenes our statement in *United States v. Leiskunas* that "playing a necessary role does not definitively prevent that same role from being minor." 656 F.3d 732, 739 (7th Cir. 2011). However, the district court in *Leiskunas* did not consider the defendant's role in the scheme as a whole. *Id.* Here, the court did consider the context and gave numerous reasons outside of Causey's "essential" nature that he qualified for the two-level enhancement, including Causey's position as co-owner of Netlink, his recruitment of buyers, and the broken promises he made to the buyers he recruited. Because it was just one consideration among many, the district court did not err in noting that Causey was an "essential" player.

Causey's final argument is that he could not be an "organizer, leader, manager, or supervisor" because "Chandler and Rainey were the true organizers and leaders" and Causey did not exercise control over any other criminally responsible party. This argument fails because we have repeatedly held that a defendant can exercise control over a "criminally responsible" party for enhancement purposes even if that individual was never charged, convicted or indicted for the "criminally responsible" act. *See, e.g., Robertson*, 662 F.3d at 878 (defendants exerted control over "participants who were not charged" in fraudulent real estate scheme); *United States v. Knox*, 624 F.3d 865, 874 (7th Cir. 2010) (finding defendant exercised control over an individual who was "never criminally charged, [but] admitted that she knowingly

participated in the scheme"). Mark was such a "criminally responsible" party. She admitted to fraudulent activities when she signed a HUD-1 statement showing she had made a "major down payment" on the house, which she knew was not true. That she was also a victim does not prevent her from being a "criminally responsible" party for sentencing purposes. *United States v. Vivit*, 214 F.3d 908, 923 (7th Cir. 2000) (finding enhancement proper because some victims of a fraudulent scheme were also uncharged criminally responsible parties who submitted fraudulent paperwork). It is also clear that Causey exercised control over her. He not only brought Mark into the scheme and convinced her to buy houses, but she listened when Causey told her not to worry about the fraudulent information on the forms she was signing because he had taken care of it. Because Causey therefore had control over Mark and she was a criminally responsible party, the enhancement was proper.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.